UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NATHANIEL TODD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. 3:17-cv-0359-GCS |
| ) | |
| VIPIN SHAH, MICHAEL SCOTT, ) | |
| FRANCIS KAYIRA, ROBERT R. BLUM, ) | |
| DR. HUGHES LOCHARD, MIKE L. FISHER, ) | |
| WILLIAM HARRIS, and ANGEL RECTOR, ) | |
| ) | |
| Defendants.[1] ) | |

## MEMORANDUM and ORDER

**SISON, Magistrate Judge:**

### INTRODUCTION AND BACKGROUND

Pending before the Court are motions for summary judgment filed by Defendants (Doc. 144, 146). Plaintiff Nathaniel Todd opposes the motions (Docs. 149, 150). Based on the record, the applicable law and the following, the Court **DENIES** the motions.

Todd brought this *pro se* action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983 (Doc. 1). On May 2, 2017, the Court entered a Memorandum and Order granting Todd leave to proceed *in forma pauperis* and appointing counsel Kaitlin Bridges to represent Todd in this matter (Doc. 21). On July 31, 2017, Todd, by and through counsel, filed an Amended Complaint (Doc. 26). The Amended Complaint

---

[1] On August 29, 2019, Todd filed a Stipulation of Dismissal of Defendant Lochard (Doc. 139).

alleges that Defendants either refused to put him on an appropriate diabetic diet or ordered that he be placed on such a diet, that plaintiff did not receive such a diet, and that defendants failed to investigate or act regarding plaintiff's diabetic diet. The Amended Complaint contains the following claims:

    Count 1 – Dr. Shah showed deliberate indifference to Todd's serious medical need (diabetes) in violation of the Eighth Amendment by, among other things, refusing to order an appropriate diabetic diet for him;

    Count 2 – Dr. Scott showed deliberate indifference to Todd's serious medical need (diabetes) in violation of the Eighth Amendment by, among other things, refusing to order an appropriate diabetic diet for him;

    Count 3 – Dr. Kayira showed deliberate indifference to Todd's serious medical need (diabetes) in violation of the Eighth Amendment by, among other things, refusing to order an appropriate diabetic diet for him;

    Count 4 – Mr. Blum showed deliberate indifference to Todd's serious medical need (diabetes) in violation of the Eighth Amendment by, among other things, refusing to order an appropriate diabetic diet for him;

    Count 5 – Nurse Rector showed deliberate indifference to Todd's serious medical need (diabetes) in violation of the Eighth Amendment by, among other things, refusing to order an appropriate diabetic diet for him;

    Count 6 – Nurse Shultz showed deliberate indifference to Todd's serious medical need (diabetes) in violation of the Eighth Amendment by, among other things, refusing to order an appropriate diabetic diet for him;[2]

    Count 7 – Nurse Hughes showed deliberate indifference to Todd's serious medical need (diabetes) in violation of the Eighth Amendment by, among other things, refusing to order an appropriate diabetic diet for him;

---

[2] On March 20, 2018, then Magistrate Judge Wilkerson granted Todd's motion to dismiss without prejudice as to Defendant Schultz (Doc. 82).

Count 8 – Mr. Fisher showed deliberate indifference to Todd's serious medical need (diabetes) in violation of the Eighth Amendment by, among other things, refusing to order an appropriate diabetic diet for him; and

Count 9 – Mr. Harris showed deliberate indifference to Todd's serious medical need (diabetes) in violation of the Eighth Amendment by, among other things, refusing to order an appropriate diabetic diet for him.

Thereafter, the Court conducted its preliminary review of the Amended Complaint pursuant to 28 U.S.C. § 1915A and found that all the claims contained in the nine counts survived review (Doc. 29).

## FACTS[3]

The following facts are taken from the record and presented in the light most favorable to Todd, the non-moving party, and all reasonable inferences are drawn in his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

Todd is currently housed at Dixon Correctional Center ("Dixon"). The events surrounding this case occurred while Todd was incarcerated at Pinckneyville Correctional Center ("Pinckneyville"). In November 2014, Todd was transferred to Pinckneyville. At the time he transferred to Pinckneyville, Todd weighed 180 pounds. The Transfer Summary notes that Todd had the chronic condition of diabetes mellitus and was taking Glipizide and Metformin twice a day.[4]

On March 18, 2015, Todd refused to have his hemoglobin A1C ("A1C") labs

---

[3] These facts are not disputed by the parties, unless noted.

[4] Todd was diagnosed with diabetes on August 24, 2009.

drawn. On April 28, 2015, Todd saw nurse practitioner Defendant Angel Rector. Rector ordered Glucophage 1000mg twice a day, Glipizide 7.5mg twice a day, Lisinopril 2.5mg daily, and a regular diet. Rector provided Todd with information regarding medical compliance, foot care, and exercises. At this time, Todd weighed 160 lbs. Rector noted that Todd refused his labs, therefore, she was unable to ascertain his diabetic control. She further noted she would attempt to get his labs and she would reschedule him for the diabetic clinic. The next day, Todd refused the lab draw.

Todd saw Defendant Dr. Vipin Shah on July 2, 2015. The medical records for this date indicate that Todd was there for chronic knee, pelvic and back concerns. Dr. Shah also noted Todd refused diabetic labs.

Rector saw Todd in the diabetic clinic on August 27, 2015, and his medical compliance was poor. Rector continued Todd's Glipizide and Glucophage prescriptions, prescribed Lisinopril 2.5mg daily, and educated him on medication compliance and exercise. At this visit, Todd weighed 172 lbs.

Next, Rector saw Todd for a follow-up visit on September 30, 2015. Rector noted that Todd had poorly controlled diabetes. He was also not in compliance with his medications. Rector further ordered labs, Accu-Cheks twice a day for a month, and a follow-up in a month's time.

On October 10, 2015, an LPN noted that Todd refused his morning (AM) and evening (HS) for Glipizide and Lisinopril. Todd was referred to a medical provider to

discuss his medication noncompliance.

Rector saw Todd on October 14, 2015. Rector educated Todd on the need to be compliant with his medication, but noted that he was not receptive, and that his last two A1C levels showed poor control. Rector revised the prescription order so that Todd could keep the medications in his cell and take them on his own.

Thereafter on October 20, 2015, Todd saw Dr. Shah. At this visit, Todd requested a special diet from Dr. Shah. Dr. Shah noted Todd was non-compliant with his medications, refused his insulin, and that his diabetic sugar levels were poorly controlled. Dr. Shah admitted Todd to the infirmary. At this time, Todd's A1C levels were 9.4, and Todd refused to take his medications. Dr. Shah testified that Todd was admitted to the infirmary to try to control his diabetes and to find the right medicine. The infirmary admissions note that Dr. Shah indicated a regular diet for Todd.

Dr. Shah saw Todd on October 22, 2015, and Todd was eating all the meals he was provided. To monitor Todd's blood sugar levels more closely, Dr. Shah ordered Accu-Chek four times a day and requested it be covered with a sliding scale of insulin. Todd denies that his Accu-Cheks were taken four times a day. Later that evening, Todd refused to take any of the blood sugar medication ordered by Dr. Shah.

Due to his objections regarding the timing and the contents of the meals he received, Todd refused to take his insulin as prescribed until 4:30 p.m. on October 23, 2015. That day, Todd told Dr. Shah that he wanted to leave the infirmary. Dr. Shah

observed that Todd was uncooperative with his Accu-Cheks and had poor control of his diabetes. As a result, Dr. Shah decided it was in Todd's best interest to remain in the infirmary.

Todd saw Dr. Shah again on October 26, 2015. Dr. Shah noted that Todd continued to be uncooperative, was in no distress, and his blood sugar had increased. Dr. Shah ordered a diabetic diet with the HS (evening) snacks, 2200 calories for six months. Specifically, the diet type was "Low Concentrated Sweets/HS Snack", and in the comments field, Dr. Shah wrote "Diabetic diet – 2200 cal." According to Dr. Shah, "Low Concentrated Sweets" means "no sugar added food, like cake, cookies, sweets," so the inmates should not be receiving sweets and may instead receive an apple or something similar. "HS snack" refers to Hours of Sleep snack or a nighttime snack.

Dr. Shah again examined Todd on October 29, 2015. Dr. Shah noted that Todd was cooperative and that his Accu-Chek with insulin was okay. Even though Todd appeared to be doing better, Dr. Shah kept him in the infirmary because Todd was not at the desired level of stability. Later that day, Dr. Shah saw Todd and noted that Todd refused his diabetic oral medications because Todd claimed the medications were not working. Todd had an increased hemoglobin A1C level, and Dr. Shah placed him on 70/30 insulin in the morning and evening for one month. Todd explained to Dr. Shah that he was afraid of going on insulin. Because Todd had high blood sugar levels and refused oral medications, Dr. Shah slowly started Todd on insulin to avoid a side effect of low blood sugar. Todd

was discharged from the infirmary on November 2, 2015.

On December 4, 2015, Todd saw Dr. Shah in the diabetes chronic clinic. Dr. Shah noted that Todd remained noncompliant with his medication. He discontinued the oral medication, reduced the insulin, and ordered a recheck of Todd's Accu-Chek, twice a day. Dr. Shah educated Todd on medicine compliance and the renewal medications process. He further advised Todd regarding foot care, the need to exercise, the signs and symptoms of low and high blood sugar, possible long term complications, and the need to stop smoking. Dr. Shah referred Todd to a diabetic specialist, Dr. Einhorn. Todd claims that he never saw Dr. Einhorn or any diabetic specialist. At this time, Todd weighed 186 lbs.

On January 17, 2016, Dr. Shah saw Todd for the last time. At this time, Todd was refusing insulin "off and on," and would only take the insulin when he thought his blood sugar was high.

On February 25, 2016, Todd saw Defendant Dr. Michael Scott for follow-up on his Accu-Cheks and to discuss his chronic right knee pain. Dr. Scott noted that Todd had a cantankerous attitude. Dr. Scott also determined that Todd's right knee had chronic degenerative deformity and no effusion, redness or crepitus was noted. Dr. Scott further indicated that Todd's Accu-Cheks were routinely elevated and greater than 250. Dr. Scott prescribed NPH insulin 20 units to be taken twice a day for three months, ordered Accu-Cheks twice daily for three months and to follow up with a doctor in two to three weeks.

On April 25, 2016, Dr. Scott saw Todd in the diabetic clinic. At this time, Todd weighed 183 lbs. Dr. Scott prescribed a regular diet and snack pack and educated Todd on exercise.

On June 27, 2016, Todd saw Rector. During this visit, Rector evaluated and diagnosed Todd with diabetic foot pain. She also ordered foot x-rays, diabetic shoes and instructed Todd on exercise habits for diabetic control and to follow-up in 10 to 14 days as needed. Additionally, Rector noted that Todd's last A1C was 10.1.

On July 7, 2016, Todd followed up with Rector for his foot pain. Rector noted that she was awaiting approval for the diabetic shoes. She also discussed the x-ray results with Todd and scheduled a follow-up visit to occur at the next chronic clinic.

On August 17, 2016, Dr. Scott examined Todd during his diabetes chronic clinic. At this time, Todd weighed 196, and his labs showed that his A1C was 10.9. Dr. Scott noted noncompliance with medications, including a description that Todd occasionally skips the morning dose. Dr. Scott continued Todd's insulin and regular diet, ordered indefinite HS snack bag, and educated Todd on foot care and exercise.

On October 13, 2016, Dr. Scott renewed Todd's previous order for low concentrated sweets/HS snack to be provided indefinitely. Specifically, the diet type was "Low Concentrated Sweets/HS snack," and the comments field read "Diabetes."

Todd saw Dr. Scott in the diabetic chronic clinic on December 2, 2016. At that time, Todd weighed 192 lbs.

On January 25, 2017, Dr. Scott noted that the nursing staff reported Todd was refusing Lisinopril and Mobic. Dr. Scott continued the Lisinopril because it was prescribed by nephrology, but he discontinued the Mobic.

On May 27, 2017, Todd saw Defendant Dr. Francis Kayira and requested a diabetic diet from Dr. Kayira. Dr. Kayira completed an examination. Todd informed Dr. Kayira that he had been refusing insulin because he was not on a diabetic diet. Dr. Kayira ordered an A1C test and educated Todd on the importance of taking his medication and of allowing nurses to complete blood draws for his lab testing.

Thereafter, Todd saw nurse practitioner Defendant Robert Blum on June 13, 2017 for an increase in his blood sugar related to being a noncompliant diabetic. Todd's A1C was 10.7 from 11.5, and his medical record indicated that Todd was refusing medication based on his diet. Blum explained to Todd the rationale for medication compliance. Todd responded that he was going to continue to make his own decisions on insulin. Blum increased Todd's insulin and again explained the need for compliance. Blum also ordered a follow-up in two weeks.

On June 30, 2017, Blum saw Todd, who showed no signs of distress. Todd also refused Mobic and Motrin. Blum noted that Todd still had uncontrolled diabetes.

In August 2017, Todd saw Blum in the diabetic clinic. At this time, Todd weighed 197 lbs. Blum ordered for Todd insulin 70/30, a HS snack, and diabetic shoes. Blum also educated Todd on foot care.

On December 20, 2017, Todd saw Blum who noted that Todd was not compliant with his diabetic medication. Blum discussed Todd's diabetes and the disease process on the body. According to the medical record, Todd stated he would not take his insulin if he is not getting a certain diet. The medical record also indicates that Blum explained the risk of uncontrolled diabetes and Todd responded, "that's not my problem." Todd weighed 194 lbs. Blum did not have any further encounters with Todd after this date.

Defendant Mike Fisher was the dietary manager from the date Todd transferred to Pinckneyville until Fisher's retirement in 2016. Thereafter, Defendant William Harris became the dietary manager at Pinckneyville. Neither Fisher nor Harris had the authority to issue a special diet order. Instead, they relied on medical professionals to issue appropriate medical diets. The responsibilities of the dietary manager included scheduling, ordering food, making appropriate changes to menus, and overseeing the diet menus, the religious menus and compliance for the same. The state dietician is responsible for making the menus. Pinckneyville had a cook that would prepare the diabetic meals without salt, butter or added sugar. Both Fisher and Harris would check the system to see if any offenders had been ordered a special diet. Todd admits that he never verbally spoke with Fisher or Harris about his diet.

A proper diet can decrease the severity and frequency of symptoms for diabetes. If a person has poorly controlled diabetes, diet is one of the factors that is important in trying to get them back on track. Dr. Kayira testified that an insulin-dependent diabetic

should be on a low-sugar diet that includes a lot of pure proteins. Rector testified that the Low Concentrated Sweets diet is separate from the HS snack diet.

An example of a meal that a typical inmate would be served is baked chicken, mashed potatoes with gravy, green beans, white cake with icing, dinner roll and condiments. A meal could also consist of a Sloppy Joe, hamburger bun, potato salad, coleslaw, barbecue pinto beans, and a cinnamon roll. Snack packs generally consisted of peanut butter, crackers and an apple. Fisher testified that there are typically no fresh fruits or vegetables, but there are possibly canned vegetables.

For a period, Pinckneyville had a brunch program where only two meals were being served a day. During this time, the morning snack pack was supposed to be provided during the insulin medication lines, and the evening snack pack was supposed to be provided by the officers and workers in the cell house.

Dr. Shah testified that according to Wexford Health's Operations Policies and Procedures, "Wexford Health will assist the Facility Administrator in ensuring that the nutritional needs of the inmates are met." Specifically, "Wexford personnel will order the diet and observe that the diet has been carried out."

There was an order for Todd to see Dr. Einhorn. Todd claims that he did not see Dr. Einhorn. Todd also testified that he did not eat on weekends due to his religious beliefs and, therefore, he would not take his medication as prescribed. Todd does not have any training regarding the proper medications to be prescribed for diabetes. The

medical Defendants contend that they educated Todd on the food and diet for diabetes. Todd contends that they did not.

### LEGAL STANDARDS

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014)(citing FED. R. CIV. PROC. 56(a)). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014). The Court's role at summary judgment is not to evaluate the weight of evidence, to judge witness credibility, or to determine the truth of the matter. Instead, the Court is

to determine whether a genuine issue of fact exists. *See Nat'l Athletic Sportwear Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

The Supreme Court has recognized that deliberate indifference to the serious medical needs of prisoners may constitute cruel and unusual punishment under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate he suffered from an objectively serious medical condition. *Id.* at 591-592. Second, the plaintiff must establish the individual prison officials were deliberately indifferent to that condition. *Id.*

The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)(citations omitted). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994)(violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm")(internal quotation marks omitted)(emphasis added)).

To show prison officials acted with deliberate indifference, a plaintiff must put forth evidence that prison officials not only knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id. Accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)(stating that "[d]eliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)(stating that "negligence, even gross negligence does not violate the Constitution.").

Assessing the subjective prong is more difficult in cases alleging inadequate health care as opposed to lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that is based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id*. (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)).

This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[] that [he] did[.]" *Whiting*, 839 F.3d at 662 (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)(alterations in the original).

However, a medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry*, 604 F.3d at 441. The Eighth Amendment does not require that prisoners receive "'unqualified access to health care.' Rather, they are entitled only to "'adequate medical care.'" *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)(citations omitted).

## ANALYSIS

Here, the parties do not dispute that Todd has a serious medical condition. Thus, the Court need only address the second prong as to all Defendants.

**Medical Provider Defendants**

The medical provider Defendants argue that Todd cannot establish that they were deliberately indifferent as they provided Todd medical treatment within medical standards and ensured that Todd had all the tools to assist his own care for managing his diabetes. Further, these Defendants argue that Todd continuously disregarded his health (by ordering sweet snacks form the commissary) and consistently failed to comply with medical treatment (refusing medications and refusing Accu-Cheks). Moreover, the Defendants contend that they had no control over what Todd was served in the chow hall, as meals and menus were developed by state employees, *i.e.*, the State Dietician and the Dietary Manager.

Todd, on the other hand, counters that the focus of this lawsuit is whether each of

the medical provider Defendants inappropriately refused to order a therapeutic diet or an appropriate diet and inappropriately failed to investigate or follow-up on a therapeutic diet order that had been entered but was not being provided. Todd disputes that any of the Defendants educated him on the need to have an appropriate diet. Todd contends that the only way to get a modified tray is to have a therapeutic diet order and only medical providers can order therapeutic diets. Further, Todd contends that he told the medical provider Defendants about the lack of education and about him not receiving a therapeutic diet.

Viewing the evidence in the light most favorable to Todd, the Court finds that material issues of fact preclude summary judgment at this point in the litigation. The medical provider Defendants contend that they worked diligently to provide Todd the appropriate medical treatment for his diabetes, that they informed Todd that a therapeutic diet order had been entered and that every time they examined or saw Todd, the medical provider Defendants educated him on diet and healthy food choices regarding his diabetes. Todd, on the other hand, testified that not once was he informed of the therapeutic diet orders; that he did not receive the therapeutic diets (that he received the same meals as general population, including sweets); that he did not receive snack bags until more than six months after he started on insulin and at times these snack bags were untimely; and that he was not educated on healthy food choices and that he never saw a diabetic specialist. During this time frame, Todd's weight fluctuated as did

Todd's diabetic symptoms despite the course of treatment ordered by the medical provider Defendants.

A reasonable jury could conclude that Todd's weight gain and out of control diabetes was attributed to him not receiving a proper therapeutic diet. An inference can be made from the record that the medical provider Defendants were aware that therapeutic diets, in addition to the other treatment that they provided, were necessary/important components in controlling Todd's diabetes. It can also be inferred that the medical provider Defendants were aware that therapeutic diets and education regarding those diets were important. It can further be inferred that the medical provider Defendants had a duty to ensure that Todd was, in fact, receiving the therapeutic diets as ordered. Wexford Health's Operations Policies and Procedures provide that it will assist the Facility Administrator in ensuring that nutritional needs are met. Further, Dr. Shah also testified that "Wexford personnel will order the diet and observe that the diet has been carried out." Todd, however, claims that he was not informed of any therapeutic diets, he was not educated on such diets and that he did not receive any such diets on a regular basis. Viewing the evidence in the light most favorable to Todd, as the Court must, the Court finds that the jury must decide whether these medical provider Defendants were deliberately indifferent to Todd regarding the issues surrounding the diabetic diet orders, including ensuring that Todd was actually provided with the therapeutic diet and educating him on the proper diet. Thus, the Court denies the motion

for summary judgment as to the medical provider Defendants.

**Fisher and Harris**

Both Fisher and Harris contend they are entitled to summary judgment because they, as non-medical professionals, were entitled to rely on the medical professionals to order Todd an appropriate diet, if medically indicated. Fisher and Harris also contend that Todd cannot show they were personally involved in any of the alleged conduct. These Defendants contend that they do not have medical education or training as to diabetes. Further, neither of these Defendants have the authority to order special diets and that they relied on the medical professionals to issue appropriate diets. Lastly, Fisher and Harris assert that they are entitled to qualified immunity. Todd contends that Fisher and Harris did not follow the applicable diet orders of the medical providers.

Similarly, as with the medical provider Defendants, the Court finds that there are questions of material fact that preclude summary judgment as to Fisher and Harris. Todd testified that he never received a special diet tray and that he always received the same meals as the other inmates in general population. Further, Todd testified that he was unaware that a therapeutic diet had been ordered for him at any point. Similarly, Todd testified that he only sometimes received snack bags. Moreover, there is conflicting evidence whether Fisher and Harris were following and/or implementing the diet orders entered. Both Fisher and Harris testified that they were responsible for making sure inmates who had therapeutic diet orders entered were receiving those diets. Also, Todd

claims that he sent 6-7 request slips to both Fisher and Harris regarding the diet and that he never received a response. (Doc. 146-1, p. 98-103).

Obviously, Fisher and Harris can assert that the lack of a therapeutic diet was the fault of the medical providers. By the same token, the medical providers could assert that a therapeutic diet was ordered, but that Fisher and/or Harris ignored such orders. Because both sets of defendants can credibly point the finger at each other, summary judgment cannot be granted. *See, e.g., Murray v. City of Chicago*, 634 F.2d 365, 366 (7th Cir. 1980)(reversing district court's grant of summary judgment and noting that in Section 1983 suit "defendants should not be permitted to 'get off the hook' by merely pointing the finger at each other."). Thus, the Court denies the motion for summary judgment as to Fisher and Harris.

Finally, the Court finds that Defendants Fisher and Harris are not entitled to qualified immunity. In 2014, it was clearly established that inmates had a right to a medically appropriate diet, including those with diabetes. *See Sellers v. Henman*, 41 F.3d 1100, 1103 (7th Cir. 1994).

## CONCLUSION

Accordingly, the Court **DENIES** Defendants' motions for summary judgment (Doc. 144, 146). The Court will set this matter via separate notice for telephonic conference to discuss the possibility of a settlement conference and possible trial dates.

Further, pursuant to the stipulation for dismissal of Dr. Hughes Lochard filed by Todd on August 29, 2019 (Doc. 139), the Court **DISMISSES without prejudice** Defendant Lochard at the close the of the case.

**IT IS SO ORDERED.**

**Dated: April 20, 2020.**

Digitally signed by Judge Sison
Date: 2020.04.20 12:06:19 -05'00'

_____
**GILBERT C. SISON**
**United States Magistrate Judge**